(C.D. 2775)

MARFREE, INC. *v.* UNITED STATES

## United States Customs Court, Second Division

[Judgment for plaintiff.]

(Decided September 22, 1966)

*John C. Ray* for the plaintiff.

*J. William Doolittle,* Acting Assistant Attorney General (*Andrew P. Vance* and *Alfred A. Taylor, Jr.,* trial attorneys), for the defendant.

Before RAO and FORD, Judges, and WILSON, Senior Judge

WILSON, Senior Judge: These protests which have been consolidated for trial involve the classification of four types of articles imported from Germany. Protest 64/1416 involves the importation of voltage testers, type No. 202; spark plug testers, type No. 191; and car-light testers, type No. 181, equipped with a probe. Protest 64/1417 involves car-light testers, type No. 181, equipped with a screwdriver bit instead of a probe.

The collector of customs classified the car-light testers No. 181 with a probe under the provisions of paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at the rate of 15 per centum ad valorem, as articles suitable for distributing electrical energy. The car-light testers No. 181 with the screwdriver bit, the voltage testers No. 202 and the spark plug testers No. 191 were classified under paragraph 396 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 22½ per centum ad valorem as screwdrivers, except for the cords which come with No. 181, which were classified under paragraph 353, *supra,* at the rate of 15 per centum ad valorem.

Plaintiff claims that all of the involved articles are properly dutiable under the provisions of paragraph 353 of the tariff act, as modified, at the rate of 11½ per centum ad valorem or other rates, depending upon the date of entry, as articles having as an essential feature an electrical element or device. However, as noted by the Government in its brief, plaintiff fails to set forth in its brief just what trade agreement, protocol, or proclamation governs the rates claimed.

The pertinent statutes herein involved are as follows:

Paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy * * *:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Other articles * * *_____ 15% ad val.

Paragraph 396 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739:

Pipe tools, wrenches, spanners, screw drivers, bit braces, vises, and hammers; all the foregoing, if hand tools not provided for in paragraph 352, Tariff Act of 1930, and parts thereof, wholly or in chief value of metal, not specially provided for_____ 22½% ad val.

Paragraph 353 of the Tariff Act of 1930, as modified:

Articles having as an essential feature an electrical element or device [Rates of duty depending upon dates of entry.]

The record in the case at bar consists of the testimony of two witnesses called on behalf of the plaintiff, and, in addition, there were introduced and received in evidence a number of samples of the imported items, and others showing the manner in which they were used. Plaintiff's exhibit 1 is a sample of the imported item invoiced as car-light testers No. 181 with a probe (R. 5–6). Plaintiff's exhibit 2 is a sample of the imported item invoiced as voltage testers No. 202 (R. 5–6). Plaintiff's exhibit 3 is a sample of the imported item invoiced as spark plug testers No. 191 (R. 6). Plaintiff's illustrative exhibit 4 is a sales brochure and sales cost sheet of the whole line of electrical testers sold by the plaintiff, including the articles under consideration. Plaintiff's illustrative exhibit 5 is a sales display of plaintiff's exhibit 1. Plaintiff's illustrative exhibit 6 is a sales display of plaintiff's exhibit 3, and plaintiff's illustrative exhibit 7 is a sales display of plaintiff's exhibit 2 (R. 25–26).

Plaintiff's first witness was Marvin J. Freed, president and sole stockholder of Marfree, Inc., the importing company, which corporation, he stated, has been in business a little over 3 years. Previous to this time, plaintiff's witness was a licensed electrician for approximately 7 years (R. 3). Mr. Freed testified that plaintiff's exhibit 1 is an auto light tester which works on the battery system, either 6 or 12 volts, and is used for testing or checking electrical circuits on automobiles by attaching the alligator clip mechanism at the end of the cord to the chassis of the car, which acts as a ground wire. When the tip of the tester is touched to a live wire, electrical elements within the handle of the tester will glow, indicating that there is a complete circuit (R. 8). The item can be used for testing fuses on automobiles in the same way by attaching the alligator clip to the chassis of the car and touching the tip of the tester to the fuse, which will cause the elements within the handle to glow, indicating electricity (R. 8). The witness testified that the element inside the tester is a gas-filled neon tube (R. 9). With respect to this item, Mr. Freed testified that plaintiff's exhibit 1 is not suitable for controlling, dis-

tributing, modifying, producing, or rectifying electrical energy (R. 27–29).

Mr. Freed testified that plaintiff's exhibit 2 is an electrical tester which is used to test or check circuits of 110 or 220 volts, such as wall outlets, fuses, extension cords, or short-circuited appliances (R. 11–12). In explanation of its use, plaintiff's witness stated that, for example, to find out if there is a short circuit in a toaster, one touches the casing of the toaster and if there is a short circuit within the toaster, there will be a glow on the inside of the tester which indicates that there is a short circuit (R. 12). Mr. Freed stated that probably the main use of this tester is to test fuses. Inside the handle is a hollow neon tube, as in plaintiff's exhibit 1, which glows when in contact with an electrical current of 110 voltage, which, however, can be activated at approximately 80 volts and be extended to approximately 400 volts (R. 14). Besides the neon tube, within the handle, there is also a 800,000 ohm resistor to protect the user of the tester against any dangerous electric shock (R. 15). Plaintiff's witness also testified that plaintiff's exhibit 2 could be used as a "light-duty" screwdriver but that it has a limited application as such, and that it is used primarily as a tester (R. 19); that within his personal knowledge its usage as a screwdriver was disappointing as the tip or screwdriver bit at the end of the article would be bent if one came across a screw that was a little bit tight and thereafter it could not be used adequately as a tester, say in a wall outlet where it would be very difficult to insert it in its bent condition (R. 21).

Mr. Freed further testified that plaintiff's exhibit 3, No. 191, is a spark plug tester which is used to check the ignition system of an automobile (R. 16); that an automobile has two electrical systems— a battery circuit, which is an accessory circuit which is tested by plaintiff's exhibit 1, and the ignition system. In the ignition system, plaintiff's exhibit 3 is used by touching it either directly to the spark plug or laying it on any part of the distributor cable itself. It will draw enough electricity through the cable to ignite the neon lamp within the handle of the tester, and the lamp will then flash if the plug is firing. In the case of a shorted plug or defective plug, it will not fire. Plaintiff's exhibit 3 can be used on currents up to 18,000 volts and may be used to check television sets as well (R. 16–17). Plaintiff's witness stated that plaintiff's exhibit 3, which also has a screwdriver bit at the end, was held out to the public as "a very light-duty screwdriver" and that there are probably a few other uses for this article in a home (R. 22). He also stated that this item would have little or no use on an automobile; that the screws used on the dashboard, upholstery, doors or other parts of automobiles are made with the Phillips head or are Allen screws which can only be removed by a Phillips head screwdriver, or by a small Allen wrench (R. 23). As

to the outlets to which the above items are sold, Mr. Freed stated that plaintiff's exhibits 1 and 3 are sold to automotive jobbers and distributors and to the automotive departments in chain stores and that plaintiff's exhibit 2 is sold through electrical supply houses, refrigeration supply houses, electronic supply houses, or to the electrical departments in chain stores (R. 24).

On cross-examination, Mr. Freed, in describing the function of plaintiff's exhibit 1, testified that when the alligator clip is attached, as in checking an automobile, the voltage comes from the battery and the electricity would come from the point of the tester and would go through the wire through the tester onto the chassis of the car, which is the ground wire, and then back to the other side of the battery— "It's just a complete circuit from one side of the line to the other side of the line" (R. 33–34). In the opinion of the witness, plaintiff's exhibit 1 does not distribute electrical energy (R. 34). The witness then defined the terms "controlling," "distributing," "modifying," "producing," and "rectifying," as used in connection with electrical energy: "To distribute electrical energy" would mean that you would have a source of electricity—in the case of an automobile, the source would be the battery, and the battery would distribute the electricity to the other parts of the car through the accessory circuit in the car (R. 34); "controlling electrical energy" means to turn it on or turn it off (R. 34); "To modify electricity" would mean to transform electricity from a higher voltage to a lower voltage (R. 34); "rectifying electricity" is generally done through an electronic tube which changes a.c. current to d.c. current (R. 35); "producing electrical energy" means having a dynamo "or some means of actually producing it through some type of energy through a dam" (R. 35).

Mr. Freed further stated that there are many uses for plaintiff's exhibit 1 on an automobile, the main use being to find out what the trouble is if a taillight is not working (R. 35); that in a taillight setup a wire goes from a battery to the socket, is attached thereto, and then the lamp is placed inside the socket. If the light is not working, the bulb is no good, or the socket is faulty, or there is a broken wire, unless the battery itself is dead (R. 35–36). Exhibit 1 is used by auto mechanics to test the accessory circuit in a car, the do-it-yourself man and the homeowner will use it, and the hot rodder will use it to test the circuit in his car. Referring to plaintiff's illustrative exhibit 6, an illustration of plaintiff's exhibit 3, the witness stated that, as disclosed by the advertising, the item in question is not limited to use on an automobile but that it is useful for boats, field equipment, and portable power (R. 40); that his company advertises the involved tester as a handy pocket screwdriver but that, as noted on plaintiff's illustrative exhibit 6, it is for use as a "light-duty screwdriver" (R.

41); and that, if the filament in this item burns out and the article is no longer useful as a tester, it may be used as a screwdriver alone. Plaintiff's witness stated that the main reason for using a tester with a screwdriver blade attached thereto, as disclosed by plaintiff's illustrative exhibit 7, is to get a good electrical contact—that if one had a probe or some other shape on the end of that particular tester, one could not, for instance, put it in a wall outlet and get a good contact, and further, that a person very likely would not "carry a sharp-pointed object in [his] top pocket" so that, in his opinion, it was very necessary that the tester be shaped in the manner indicated (R. 42). The imported items were found in the automotive and electrical departments of various chain stores (R. 42). Plaintiff's witness then testified that all of the imported items work by the flow of voltage, which he stated is electrical pressure as distinguished from current which is the electricity itself (R. 45–46). He further stated that all of the imported items in their ordinary use cannot function without applying electrical energy (R. 46)—they must be energized electrically (R. 47). On redirect examination, Mr. Freed stated that, in his opinion, the testers here involved, while used for testing electrical energy, do not control, distribute, modify, produce, or rectify electrical energy (R. 48).

Plaintiff's second witness was Mr. Arthur Levitt who stated that he was an electrical contractor, having been so employed for about 7 to 8 years. He has had experience with plaintiff's exhibit 2 for about 2 years, using it for testing anything that needs to be checked, and also for testing electrical outlets or fuses (R. 52–54). The witness stated that he does not use exhibit 2 specifically as a screwdriver, but that, if he is testing something and needs a screwdriver, he does make an attempt to use it (R. 54). Mr. Levitt further stated that he preferred plaintiff's exhibit 2 as a tester because it could be conveniently carried in his pocket without carrying all the paraphernalia of the other type testers which have wire leads or test bulbs on them. (R. 54).

On cross-examination, Mr. Levitt testified that the normal place for testing for voltage is at an electrical outlet or sometimes a fuse to check if the fuse is good (R. 55). He stated that, when he had used plaintiff's exhibit 2 as a screwdriver, he had bent the bit when the screws were in too tight. The witness testified that before plaintiff's exhibit 2 came on the market he had used a lamp bulb in a socket for testing (plaintiff's illustrative exhibit 8) (R. 56–57).

In the case at bar, plaintiff in its brief, contends that the primary use of the items here involved is in testing and checking electrical energy. In this connection, as appears from the discussion in its brief, plaintiff apparently is under the impression that the collector

in the classification of said merchandise involved the similitude provisions of paragraph 1559 of the tariff act. An examination of the official papers in this case discloses, however, that the classifications so made were made directly either under paragraph 353 of the act, as modified, as articles "suitable for producing, rectifying, modifying, controlling or distributing electrical energy" or under paragraph 396 of the tariff act as "screw drivers" without involving the similitude provisions of the tariff act. In our opinion, the cases cited by the plaintiff in its brief on the question of "similitude," are not pertinent to the disposition of the issues herein.

As heretofore indicated, the items designated as "car-light testers No. 181 with a probe," represented herein by plaintiff's exhibit 1, were classified under paragraph 353 of the tariff act, as modified, *supra*, as articles suitable for distributing electrical energy. In our opinion, the merchandise represented by plaintiff's exhibit 1 does not distribute electrical energy. In this connection, plaintiff's witness, Freed, stated, without contradiction, that plaintiff's exhibit 1 is not suitable for "distributing" electrical energy (R. 28). He testified that these car-light testers merely check or test the presence of electrical energy on the battery circuit system of an automobile (R. 8). The classification of these testers under paragraph 353, *supra*, as articles suitable for "distributing" electrical energy, is not supported by the record herein. On the other hand, the record in this case establishes, in our opinion, that the involved car-light testers (plaintiff's exhibit 1) have as an essential feature an electrical element or device. The element in the handle of the article is a hollow neon tube, an electrical element, which will glow when in contact with electricity (R. 9) and which is essential to accomplish the purpose for which the item was designed, namely, for testing purposes to determine the presence of electricity. Accordingly, these car-light testers (plaintiff's exhibit 1), having as an essential feature an electrical element or device, are properly classifiable as such articles at the applicable rates of duty, depending upon the dates of entry, under paragraph 353 of the Tariff Act of 1930, as modified.

With respect to the merchandise represented by plaintiff's exhibits 2 and 3, classified under paragraph 396 of the tariff act as "screw drivers" and likewise claimed properly classifiable under paragraph 353 of the act, as modified, as "articles having as an essential feature an electrical element or device," substantially the same testimony as to their use was given by plaintiff's witness, Freed, as to these items as was given by him with respect to the use of plaintiff's exhibit 1. Each of these items also has as an essential feature an electrical element, a hollow neon tube in the handle of the article which is energized and glows by contact with an electrical current. In our opinion, the classification of these articles, represented by plaintiff's exhibits 2 and

3 under paragraph 396 of the tariff act as "screw drivers" was improper. Such use of these articles as screwdrivers, as indicated by the record herein, is merely incidental to the main purpose for which these items were designed, namely, as electrical testers for testing or checking electrical energy. In fact, it is questionable whether or not the screwdriver bit in the articles advertised as "light duty" screwdrivers, because of their construction, can be properly employed as screwdrivers. Plaintiff's second witness testified in this connection that he uses plaintiff's exhibit 2 "for testing electrical outlets or fuses" (R. 54) but that he does not use the screwdriver bit on plaintiff's exhibit 2 "specifically as a screwdriver" (R. 54) but only as an auxiliary article. (R. 55)

In *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050, our appellate court, page 54, set forth the conditions necessary for classification of an article under paragraph 353 of the tariff act as "articles having as an essential feature an electrical element or device" as follows:

* * * First, is it essentially an electrical article? The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, for it must be manifest, that if it be not an electrical article, it does not come within the division at all. Second, if it is such an electrical article, is it an article named in the language, or within the class of articles named in this paragraph?

On the basis of the record here presented, the involved items meet the test for "articles having as an essential feature an electrical element or device," as above indicated. Accordingly, they are properly classifiable as such at the applicable rates of duty, depending upon the dates of entry, under the provisions of paragraph 353 of the Tariff Act of 1930, as modified. The claim in each of these protests is sustained.

Judgment will issue accordingly.